# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# (*DANVILLE DIVISION*)

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Case Number: 4:18CR00011-04 |
| ) | |
| **DASHAUN LAMAR TRENT** ) | |

### MOTION IN LIMINE TO EXCLUDE BALLISTICS EVIDENCE, OR ALTERNATIVELY, FOR A *DAUBERT* HEARING

Your Defendant, Dashaun Lamar Trent, respectfully moves this Court for entry of an ORDER excluding the government's ballistics evidence and objects to all proposed trial exhibits relating thereto in the above-named case, or in the alternative, to conduct a Daubert hearing to determine if the government's toolmark/ballistics evidence is sufficiently reliable under Federal Rule of Evidence 702 and states the following in support thereof:

(1) Your defendant stands indicted in a multi-count, multi-defendant RICO case alleging that members of the Rollin 60s Crips street gang violated the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962, Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959, and other related charges.

(2) The First Superseding Indictment alleges, *inter alia*, that your defendant, conspiring with the other defendants, engaged in the following overt acts:

-June 15, 2016: did shoot and attempt to murder Armonti Devine Womack and Dwight Montel Harris;

-August 20, 2016: did shoot and murder Christopher Lamont Motley and attempt to murder Justion Wilson;

-August 24, 2016: did shoot and attempt to murder Tyliek Conway;

-December 2015 through August 2016: committed numerous assaults with a deadly weapon.

-1-

(3) On June 14, 2019, the United States disclosed, in timely fashion, her 2,125 trial exhibits to defense counsel. Among those exhibits,[1] several deal with firearms, ballistics, and toolmark identification. Your defendant objects to the introduction into evidence of the aforesaid exhibits.

(4) The United States has given notice that she will call the following individuals as expert witnesses in the area of firearms, ballistics and toolmark identification through whom the aforementioned exhibits will be introduced:

    (i) Scott McVeigh (Prince George's County (MD) Police Department);

    (ii) Courtney Etzelmiller (Virginia Department of Forensic Science);

    (iii) Wendy Gibson (Virginia Department of Forensic Science).

(5) The ballistics/toolmark exhibits are grouped in reference to each of the three shootings alleged in the Superseding Indictment as well as three other shootings which are not specifically linked to any other count of the Superseding Indictment.[2] Moreover, there are additional ballistics/toolmark exhibits associated with two other events not charged in the Superseding Indictment: a traffic encounter on November 2, 2016, and the execution of a search warrant at 252 Parker Road, Danville, VA on November 4, 2016. The following represents the ballistics/toolmark exhibits and their respective crime scene/event association:

-Exhibits 15 through 23: house shooting Sunset Drive (non-indictment)

-Exhibits 59 through 72: house shooting Garland St./car on Berryman Ave. (non-indictment)

-Exhibits 157 through 162: attempted murder Armonti Womack and Dwight Harris 06/15/16

-Exhibits 231 through 233: murder Christopher Motley/ attempted murder Justion Wilson

-Exhibits 245 through 258: murder Christopher Motley/ attempted murder Justion Wilson

-Exhibits 289 through 291: attempted murder Tyliek Conway 08/24/16

-Exhibits 311 and 312: a traffic encounter on 11/02/16 (non-indictment)

---

    [1] 15-24, 59-72, 157-162, 231-233, 245-258, 289-291, 311-312, 314-315, 319-322, and 323 -327.

    [2] The shooting of house on Sunset Drive in Danville, VA on December 9, 2015; the shooting of a house a house on Garland Street in Danville, VA on April 26, 2016 and the shooting at a car on Berryman Avenue in Danville, VA on April 26, 2016;

-Exhibits 314 and 315: a traffic encounter on 11/02/16 (non-indictment)

-Exhibits 319 through 322: search warrant 252 Parker Road (non-indictment)

-Exhibits 323 through 327: various other ballistics/tool mark exhibits including video.

## I.     INTRODUCTION

The government seeks to introduce various reports and certificates of analysis which contain various types of language intended to convince the jury that "science" will prove that a particular shell casing was fired from a particular firearm or that a group of shell casings are limited to a particular gunmaker and/or a certain limited number of firearms. For example, the United States intends to offer in her case-in-chief at trial, testimony that particular ammunition found at one crime scene in Danville, Virginia was fired from one particular gun later found in Hyattsville, Maryland. Specifically, the government will offer testimony in the form of ballistic/toolmark evidence[3] that ONE (1) .40 caliber Smith &Wesson fired cartridge case found on August 20, 2016, at the Christopher Motley homicide[4] crime scene in Danville, VA, was fired from a firearm found on April 29, 2017, during a vehicle search at Glenridge Communny Park located in Hyattsville, MD (Prince George's County).

Pursuant to Federal Rule of Criminal Procedure Rule (hereafter "FRCP") 16(a)(1)(G), the United States seeks to adduce this ballistic/toolmark evidence from Scott C. McVeigh (hereinafter "McVeigh") of the Prince George's County Police Department in the form of expert testimony. McVeigh notates that:

> "[t]hrough direct microscopic comparison, it was determined that the one (1) caliber .40 S&W fired cartridge case (Item 2) recovered in incident # 1 was identified as having been found in the Smith & Wesson brand pistol (Item 01, serial number FYH4828) recovered in incident #2."[5]

---

[3]     Exhibits 246 through 257.

[4]     The August 20, 2016 crime scene evidence is related to the murder of Christopher Motley and the attempted murder of Justion Wilson as set forth in Counts 1, 10, 11, 12, and 13 of the First Superseding Indictment.

[5]     Government Exhibit 256.

McVeigh does not do not divulge the facts or observations upon which this conclusion is based, or the standards applied to reach this conclusion other than a cursory statement that it was done by utilizing "direct microscopic comparison."[6] It is entirely possible that the testimony will not meet even the generally accepted standards of forensic firearms identification. Moreover, even if it does, the evidence is inadmissible under Rule 702 of the Federal Rules of Evidence (hereinafter "FRE") because the conclusions are not in fact the product of reliable principals and methodology.

The purported expert testimony is based on faulty assumptions - such as that all guns leave unique marks on bullets and casings fired through them. The purported expert testimony is also utterly subjective and standardless with no requirement as to how many similarities it takes to declare a "match" or how many differences it takes to rule one out. Most troubling, the Prince George's County Police Department, like the vast majority of local, state and federal firearm examiners, make no attempt to utilize modern measurement equipment to more accurately measure the alleged "toolmarks" to obtain a more accurate and quantifiable comparison that can be subject to statistical analysis. The government has failed to meet its burden of establishing that the proper expert testimony is based on a valid and reliable methodology and, therefore, is inadmissible. McVeigh's "match" of a spent cartridge casing from the Motley homicide crime scene in Virginia to a Smith & Wesson .40 caliber firearm found in Maryland is purely an exercise in subjective declarations - namely, it's a match because he declares it to be a match.[7]

Similarly, the government intends, through another expert witness (Courtney Etzelmiller) to introduce a certificate of analysis trying to convince the jury that, scientifically, a shell casing "was microscopically examined and found to exhibit markings that may be suitable for identification with the firearm in which it was fired."[8] This particular certificate of analysis does not do not divulge the facts or observations on which this conclusions is based, or the standards applied to reach this conclusion other than a cursory statement that it was done by utilizing microscopic examination. It

---

[6] *Id*.

[7] McVeigh is a police officer with a Criminal Justice certificate from a two year college - not a trained scientist or engineer.

[8] Exhibit 232.

-4-

is another example of attempting to add science where none exists by merely stating subjective conclusions and printing them on a piece of paper signed by a "Forensic Scientist" from the Department of Forensic "Science." The expert witness, Courtney Etzelmiller, has a Masters Degree in "Forensic Science" with an area of emphasis in pyschology just like the undergraduate diploma she holds in psychology. Importantly, she does not hold a degree in materials engineering, metallurgical engineering, materials science, or any other academic discipline which deals with the actual science of what happens to metal when it comes into contact with other metal as a result of high pressure and explosive forces such as gun powder.

The government's final ballistics/toolmark expert witness is Wendy Gibson (hereinafter "Gibson") from the Commonwealth of Virginia Department of Forensic Science. Through Gibson, the United States seeks to state to the jury declarations found in the following government trial exhibits:

| | |
|---|---|
| Exhibit 15: | *cartridge cases which were identified as having been fired in one (1) firearm*; |
| Exhibit 16: | *a potential association exists between Item 1 cartridge cases and the Item 32 cartridge case*; signed by Therese C. Moynihan not Wendy Gibson; |
| Exhibit 23: | *the above listed Item 12 cartridge cases were identified as having been fired in the firearm represented by Item 11 test fired cartridge case*; |
| Exhibit 70: | *a potential NIBIN association exists between the previously imaged Item 23 cartridge cases submitted;* signed by Laura Hollenbeck not Wendy Gibson; |
| Exhibit 63: | *Potential NIBIN associations exit between Item 26 listed above, one (1) of the Item 1 cartridge cases submitted . . .and the Item 32 cartridge case . . . .* signed by Bronwyn Devlin not Wendy Gibson; |
| Exhibit 64: | *the above listed Item 23 cartridge case was identified as having been fired in the same firearm as the Item 8 cartridge case submitted;* |
| | *the above listed Item 26 cartridge case was identified as having been fired in the same firearm as the Item 1 cartridge case submitted*; |
| Exhibit 66: | *a potential NIBIN association exists between the previously imaged Item 4 cartridge case . . . and the Item 70 cartridge case . . . .;* signed by Laura Hollenbeck not Wendy Gibson; |

Exhibit 67: *One (1) of the Item 4 cartridge cases was microscopically examined and entered into the NIBIN system. . . .No associations were made at this time;* signed by Bronwyn Devlin not Wendy Gibson;

Exhibit 68: *Subsequent microscopic comparisons were conducted and the above listed Item 4 cartridge cases labeled A through F were identified as having been fired in the same firearm as the item 70 cartridge case submitted . . . . ;*

Exhibt 158: *Item 8, a Winchester brand caliber .40 Smith & Wesson cartridge case, and Item 41, a Remington brand caliber .40 Smith & Wesson cartridge case, were identified as having been fired in one (1) firearm;* signed by Laura Hollenbeck not Wendy Gibson;

Exhibit 159: *Item 8 listed above was identified as having been fired in the same firearm as the Item 23 cartridge case submitted . . . .;*

Exhibit 290: *Item 6 contains fourteen Federal brand caliber 9mm Luger cartridge cases which were microscopically examined and identified as having been fired in the same firearm;*

Exhibit 311: *Potential NIBIN associations exist between the following: *The imaged item 1T cartridge case (test fired in the Item 1 pistol listed above) and the imaged Item 2 cartridge case submitted under FS Laboratory # W16-7644 . . . ;*

Exhibit 312: *Subsequent microscopic comparisons were conducted and the Item 14 and 23 cartridge cases . . . were identified as having been fired in the item 11 pistol . . . .;*

Exhibit 319: *Item 11, a Federal brand caliber .45 Auto cartridge case, was microscopically examined and entered into the NIBIN system;*

Exhibit 320: *subsequent microscopic comparisons were conducted with the following results: *the Item 1 cartridge cases submitted under FS Laboratory # W16-8807 were identified as having been fired in the firearm represented by the Item 11 cartridge case listed above.*

None of Ms. Gibson's declarations come with any standards, methodology, statistical analysis, or error rate. It is nothing more than eyeballing two metal cartridge casings and subjectively declaring that they look similar enough to make a "scientific" opinion about their relationship to a particular firearm.

## II. ARGUMENT

-6-

## A. EXPERT TESTIMONY IS NOT ADMISSIBLE UNLESS THE PROPONENT OF THE TESTIMONY ESTABLISHES THAT THE TESTIMONY IS BOTH RELIABLE AND RELEVANT.

A trial judge "faced with a proffer of expert scientific testimony, [ . . . ] must determine at the outset, pursuant to rule FRE 104(a), whether the expert is proposing to testify to 1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[9] A court performing this inquiry must make a preliminary assessment of, first, "whether the reasoning or methodology underlying the testimony is scientifically valid" and second, "whether that reasoning or methodology properly can be applied to the facts in issue."[10] In other words, before proffered expert testimony may be admitted, the trial judge must "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."[11] The trial judge's gate-keeping obligation to ensure that any and all testimony "is not only relevant, but reliable" applies to "all expert testimony," regardless of whether the expert testifies or purports to testify on the basis of scientific, technical or other specialized knowledge.[12]

In 2000, Rule 702 of the Federal Rules of Evidence was amended to reflect the principles set forth in the *Daubert* case and other subsequent case law.[13] Rule 702, as further amended in 2011 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and

---

[9] *Daubert v. Merrill Dow Pharmaceuticals ("Daubert")*, 509 U.S. 579, 592 (1993).

[10] *Id*.

[11] *Id*. at 597.

[12] *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) quoting *Daubert*, 509 U.S. at 589.

[13] FRE 702, *Notes of Advisory Committee on 2000 Amendments*.

Case 4:18-cr-00011-MFU-RSB   Document 570   Filed 07/29/19   Page 7 of 12   Pageid#: 2694

(d) the expert has reliably applied the principles and methods to the facts of the case.[14]

### 1. BURDEN OF PROOF.

The "proponent [of the expert testimony] has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."[15] On remand from the Supreme Court of the United States in *Daubert*, the Ninth Circuit stated that the burden is on the proponent of expert testimony to establish a *prima facie* case that the evidence satisfies the requirements of Rule 702.[16] If the proponent of the expert testimony makes a *prima facie* showing that the testimony meets the requirements of Rule 702, the opposing party is then entitled to challenge that showing. Where the opposing party raises a material dispute as to the admissibility of expert scientific evidence, the court should then hold an *in limine*, so-called "*Daubert* Hearing," "to consider the conflicting evidence and make findings about the soundness and reliability of the methodology employed by the scientific experts."[17]

### 2. RELIABILITY.

In determining the reliability of proffered expert testimony, the focus is on principles and methodology, not on the conclusions they generate.[18] "Proposed testimony must be supported by appropriate validation, i.e., 'good grounds' based on what is known."[19] The reliability inquiry is a flexible one, with substantial discretion left to the trial judge to determine how to evaluate the reliability of a particular expert's testimony.[20] The *Daubert* Court identified five non-exclusive

---

[14] FRE 702.

[15] FRE 702 Advisory Committee Notes 2000 Amendments citing *Bourjaily v. United States*, 483 U.S. 171 (1987).

[16] *Daubert v. Merrill Dow Pharmaceuticals*, 43 F.3d. 1311, 1319 [footnote 10] (9th Cir. 1995).

[17] *Id.*

[18] *Daubert*, 509 U.S. at 595.

[19] *Daubert*, 509 U.S. at 590.

[20] *Kumho Tire Co., Ltd. v. Carmichael ("Kumho")*, 526 U.S. 137, 141, 152 (1999).

factors to be considered in evaluating reliability: (1) whether the theory or technique can be and has been tested, (2) whether the theory or technique has been subject to peer review and publication, (3) whether a particular scientific technique has a known or potential rate of error, (4) whether standards controlling the technique's operation exists and are maintained, and (5) whether the technique is generally accepted in the relevant scientific community.[21] However, "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."[22] Thus, the factors listed in *Daubert* will not always be applicable or instructive. For example, presence of the general acceptance factor will not "help show that an expert's testimony is reliable where the discipline itself lacks reliability."[23]

Finally, the Fourth's Circuit mandate to trial judges is quite instructive as a 'road map' of how to navigate the Sargasso Sea of *Daubert* challenges:

> We need not lay out the manner in which the *Daubert* analyses should be conducted. The law on that topic is well settled. But on a most basic level, to be admissible, an expert testimony must be of "scientific, technical or other specialized knowledge." Fed. R. Evid. 702(a) It must not be based on "belief, speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244 (4th Cir. 1999) And it is not enough for an expert to rely on his subjective belief. *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Without testing, supporting literature in the pertinent field, peer reviewed publications or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true "because I say so."[24]

Because this Court must perform a gatekeeping function with regard to this type of evidence, it should conduct a *Daubert* hearing to require the United States to demonstrate that toolmark examination in the field of ballistics is in conformity with the *Daubert* five factors. For further consideration of the science and law in this area, counsel for your Defendant submits and attaches a law review article authored by Adina Schwartz entitled: *A Systemic Challenge to the Reliability and Admissibilty of Firearms and Toolmark Identification* which was published in the The Columbia

---

[21] *Daubert*, 509 U.S. at 593-594.

[22] *Kuhmo*, 526 U.S. at 141.

[23] *Kuhmo*, 526 U.S. at 151.

[24] *Small v. Welldyne, Inc.*, 927 F.3d 169, 176-77 (4th Cir. 2019).

Science and Technology Law Review in 2005 (Volume VI). Additionally, the Court is provided with the **Report and Recommendation** of the Honorable Paul W. Grimm, United States Magistrate Judge from a 2009 criminal case styled *United States of America v. Tavon Mouzone.*[25] Judge Grimm's review of this issue is cogent, thorough, comprehensive, and provides valuable insight into the challenges courts face when dealing with toolmark examintion in firearms/ballistics cases.

### 3. RELEVANCE.

Expert testimony should be excluded where it is irrelevant to the issues in the case.[26] The relevance inquiry is an important one because "scientific expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'"[27] "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case and that it will not mislead the jury."[28] Your defendant concedes that the relevancy prong of *Daubert* is not at issue in this case. The issue of whether a firearm found in Maryland "matches" a spent cartridge found at the Christopher Motley crime scene is highly relevant.

### B. THE PROFFERED "EXPERT" BALLISTICS EXHIBITS SHOULD BE EXCLUDED BECAUSE THEY FAILS TO MEET THE ADMISSIBILITY REQUIREMENTS OF *DAUBERT* AND RULE 702.

The government has failed to make even a *prima facie* showing that the proffered evidence meets the requirement of Rule 702. For example, it is the "subjective belief" about which the 4th Circuit warned in *Small* that undermines the evidence referenced in Government Exhibits 246 through 257. In the instant case, and focusing on the government's expert Scott McVeigh, the United States has provided nothing more than McVeigh's bald assertion that a spent cartridge casing

---

[25] Case Number 1:08-cr-00086, The United States District Court for the District of Maryland. [ECF 721]

[26] *See Daubert*, 509 U.S. at 591-592.

[27] *Daubert*, 43 F.3d at 1321 n. 17 (quoting *Daubert*, 509 U.S. at 595).

[28] *Id*.

-10-

from Virginia delivered to the police in Maryland **"was identified as having been fired"** from the firearm recovered in Maryland. The reports provided to defense counsel neither explain the methodology the expert followed to reach his conclusion nor point to any external source to validate that methodology. Here, defense counsel, and likewise the Court, is presented with only the expert qualifications and his subjective conclusion. In other words - it's a match because McVeigh says it is.

The United States has provided no information as to what markings, if any, upon which McVeigh relied, on the cartridge casing to reach his conclusion. The United States has not provided McVeigh's error rate however, it is anticipated that he will claim an error rate of 0%. The government cannot provide documentation whether McVeigh's opinion was compared to a standardized protocol for toolmark identification since there are no recognized standards in the field. Nothing has been provided by McVeigh to show how many similarities it takes to declare a "match" or how many differences it takes to rule it out. In short, McVeigh compared to side-by-side photographs (Exhibit 255) and 'eyeballed' it and declared the cartridge case from the fired weapon in Maryland matched the cartridge case found at the Christopher Motley crime scene. No science, no statistical probability, no standards - just: 'it's a match because I say it is." The same can also be said of the government's proposed trial exhibits associated with Courtney Etzelmiller and Wendy Gibson.

WHEREFORE, your Defendant, Dashaun Lamar Trent, by counsel, respectfully moves this Court for entry of an ORDER excluding the government's ballistics evidence and objects to all proposed trial exhibits relating thereto in the above-named case, or in the alternative, to conduct a *Daubert* hearing to determine if the government's toolmark/ballistics evidence is sufficiently reliable under Federal Rule of Evidence 702.

    Respectfully submitted,
    DASHAUN LAMAR TRENT
    By /s/   Chris K. Kowlaczuk

Christopher K. Kowalczuk, Esquire
P. O. Box 11971
Roanoke, VA 24022
(540) 345-0101
    Counsel for the Defendant

Patrick J. Kenney, Esquire
P.O. Box 599
Roanoke, VA 24004
(540) 491-0423
    Counsel for the Defendant

CERTIFICATE OF SERVICE

    I, Christopher K. Kowalczuk, Esquire, hereby certify that on this 29th day of July, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

    /s/    Chris K. Kowalczuk