# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# (*DANVILLE DIVISION*)

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case Number: 4:18CR00011-04** |
| ) | |
| **DASHAUN LAMAR TRENT** ) | |

**DEFENDANT'S MOTION TO DISMISS FIRST SUPERSEDING INDICTMENT**

COMES NOW Your Defendant, Dashaun Lamar Trent, by counsel, and respectfully moves this Court for entry of an ORDER dismissing the First Superseding Indictment now pending against Your Defendant and states the following in support thereof:

(1)  Your Defendant, Dashaun Lamar Trent, has been indicted, and on a number of serious felony charges including racketeering, and various other related charges alleging murder, attempted murder, and the use of firearm in relation to each of those crimes.

(2)  On October 15, 2019, at approximately 3:50 p.m., after SIX (6) fulls days of *voir dire*, the jury in this case was sworn and jeopardy, for constitutional purposes, attached.

(3)  At approximately 5:00 p.m. on October, 15, 2019, the undersigned counsel learned of the possibility that a "Special Grand Jury" had been convened at the behest of Michael Newman, Esq., Commonwealth's Attorney for the City of Danville, VA, and cross-sworn in this case as a special Assistant United States Attorney.  It was further learned that the United States, in contravention of this Court's various discovery Orders, had not provided the defendants with transcripts of the said "Special Grand Jury."[1]

---

[1]  It was later determined that a multi-jurisdictional grand jury was empaneled and not a "Special Grand Jury".

(4) Within three hours of discovery this information, the undersigned counsel filed *Defendant's Motion to Produce Special Grand Jury Transcripts*.[2]

(5) On October 16, 2019, in open Court, outside the presence of the jury, the following exchange took place between the Court and AUSA Heather Carlton, Esq.:

```
13         THE COURT:  My question is, is there any other
14  evidence presented to this multi-jurisdictional grand jury
15  that bears on the charges that are either in 4:18CR11 or
16  4:18CR12, the Bloods and the Crips cases?
17         MS. CARLTON:  No.
```

Ms. Carlton's answer was clear and unequivocal - and the Court now knows it was false.

(6) Out of an abundance of caution, the Court queried further:

```
18         THE COURT:  Okay.  Let me ask you this question:  Is
19  there any other testimony, other than these two transcripts --
20  and these are of Lashaunda Washington and Ontwoinette
21  Epperson, and I read them this morning.  Other than these two
22  transcripts, is there any state grand jury testimony that
23  relate in any way to the charges in this case or in the
24  4:18CR12 that has not been turned over to these defendants?
25         MS. CARLTON:  No.  And we weren't trying to hide
```

```
                                                              6
            U.S.A. v. Davis, et al. - 10/16/2019
1  these transcripts.
```

The Court's follow up question was even more specific and was clearly asking Ms. Carlton about anything related to the instant case or the companion case 4:18-CR-00012. Ms.

---

[2] ECF 924.

Carlton, once again, without the slightest hesitation lied to the Court and then attempted to bolster her credibility by assuring the Court that the United States wasn't "trying to hide these transcripts."

(7) The Court, unaware that falsehoods are being presented by Ms. Carlton, continues to be thorough and, to ensure that the defendants receive a fair trial, continues asking the same question:

```
 4        THE COURT:  I appreciate that, and I just want to be
 5   very clear about this, okay?  I want to be very clear, and I
 6   want to make sure that the government is assuring me and
 7   assuring these defendants that there is no other state grand
 8   jury testimony that bears in any respect on the charges in
 9   this case or in the 12 case, either the Crips or the Bloods
10   case, that has not been produced to these defendants.
11        MS. CARLTON:  Well, no.  The answer is no.  But to
12   the extent, like, that Phillip Miles has a conviction for
13   distribution of marijuana, there could have been in that time
14   some grand jury testimony regarding that count --
15        THE COURT:  That's not what I'm concerned about.
16        MS. CARLTON:  Okay.
17        THE COURT:  What I'm concerned about is a state grand
18   jury investigating the charges that are at issue in this case.
19        MS. CARLTON:  Right.  Then the answer is no.
```

When asked by the Court whether "there [is any] other state grand jury testimony that bears in any respect on the charges in this case." She is emphatic: ***"Well no. The answer is no."*** When the Court, for the fourth or fifth time informs her that the area of concern for the Court is the state grand jury - she states: ***"Right. Then the answer is no."***

(8) The Court, seemingly satisfied that the United States has been sufficiently forthcoming in her answers, takes a slightly different tact by bringing Mr. Newman into the discussion:

```
 3         THE COURT:  Okay.  All right.  I appreciate you're
 4    telling me these two state grand jury transcripts are all
 5    there is.
 6         Mr. Newman, is that right?
 7         MR. NEWMAN:  Yes, Your Honor, that's the only
 8    transcripts I'm aware of that touches specifically on the
 9    actions that are before Your Honor today.  The August 20th,
10    August 24th, the July -- I'm sorry, June 15th, or April 26
11    days.
```

An astonishing and false answer since we now know that Mr. Newman himself conducted the examination of two defendants in the instant case (Tenikqua Fuller and Laquonte Adams) before the multi-jurisdictional grand jury.

(9) The Court then inquires about whether or not the multi-jurisdictional grand jury proceeds are recorded:

```
 6         MR. NEWMAN:  Judge, any and all testimony in front of
 7    the state multi-jurisdictional grand jury was taped.  All of
 8    them not transcribed.  We still have all tapes.
```

(10) Yet again, the Court continues to inquire of the Unite States to ensure "that these two transcripts that have been provided this morning are the only transcripts from the

state multi-jurisdictional grand jury that have not been produced in discovery that relate to the allegations in this case. Is that right Ms. Carlton?"[3] Her answer, again false, is "**Yes**."[4] Following a brief huddle up at counsel table amongst counsel for the United States, Ms. Carlton continued her mendacity and, not in response to any new question by the Court, offered the following falsehood:

```
20        MS. CARLTON:  So the question is -- the concern is,
21   again, these defendants have been under investigation by the
22   Danville police at different times.  I mean, they been
23   arrested, they have misdemeanor convictions, certainly.  We
24   just want to be clear, there could have been other occasions
25   unrelated to any sort of gang or murder investigation where
```

                                                                11
                         U.S.A. v. Davis, et al. - 10/16/2019
```
1   someone would have gone into the grand jury to testify
2   about -- like, Phillip Miles' arrest with two pounds of weed,
3   you know, blah, blah, blah, that would have been unrelated.
4   So that's what we're trying to be precise and clear about.
5   But any grand jury testimony related to a gang investigation,
6   into this gang violence, the Rollin 60s Crips, that's it,
7   that's the two.
8        THE COURT:  Okay.  I just wanted -- that issue needed
9   to be vetted.
10       MS. CARLTON:  Of course.
11       THE COURT:  And I'm glad we did it.
```

---

[3]     October 16, 2019, transcript at page 10 - lines 9 through 16.

[4]     *Id.* at line 17.

The icing on the cake came when the Court expressed its belief that this particular issue needed to be vetted and Ms. Carlton replies: **"Of course."** In other words, thank you Judge for being so thorough and giving the United States the opportunity to dispel any concern about this multi-jurisdictional issue. Never mind that the entire colloquy between the Court and both counsel for the United States (Ms. Carlton and Mr. Newman)[5] was nothing short of a fraud on the Court - an outright misrepresentation done so with a purpose to dissuade the Court from ensuring that these defendants receive a fair trial. In other words, an obstruction of justice.

(11) This mendacious and deceitful conduct by Ms. Carlton and Mr. Newman are nothing short of a direct attack on the rule of law. There is simply nothing the Court can do, other than a dismissal, to assure the EIGHT (8) defendants currently on trial that the United States will conduct herself in a manner consistent with seeking justice. Ms. Carlton and Mr. Newman, by their actions, seek nothing but convictions at all cost and have demonstrated that they will stop at nothing - including lying to the Court - on the record and in open court to achieve their purpose.

(12) The materials produced, notwithstanding the falsehoods offered to the Court trying to prevent same, demonstrate that the First Superseding Indictment should be dismissed. A claim of prosecutorial misconduct has three components:

> "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[6]

---

[5] The undersigned counsel points out that AUSA Ron Huber, Esq. did not participate in any way in the false declarations to the Court.

[6] *United States v. Les Christopher Burns*, 6:13-cr-00022, July 14, 2016 at page 5 citing *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

In the instant case, some of the materials produced at this late hour will definitely be favorable to the accused. For example, the multi-jurisdictional grand jury testimony of Courtney Demond Davis of December 16, 2016, reveals the possibility that the murder of Christopher Motley was done at the hands of "Boosie the Bull":

```
14   Q. So you're saying that it was supposed to be for Peter Roll?
15   A. Yes.
16   Q. And it was a Trents?
17   A. Yes, that's … that's … that's what the word was.
18   Q. All right, word from whom?
19   A. But then … but they … that's what people were sayin'. See, it was … it's two
20      different … see, it's two different … two different sayings. Some people say it
21      was Boosie. Some people say it was, ah … 'cause Boosie, he be with Kevin Trent
22      also, know what I mean. Some people say it was … it was Boosie the Bull …
23      some people say it was him that did it, know what I mean? It's just … I never
24      heard it from …
```

The late disclosure of this exculpatory evidence causes the defendant to suffer prejudice because he no longer has the ability (because of time constraints) to properly investigate this exculpatory claim. Another example is the December 12, 2016, multi-jurisdictional grand jury transcript of Laquonte Adams. Upon review of same, and of note, is the complete lack of meaningful information regarding alleged gang structure and/or various alleged gang-related shootings in Danville at that time. Moreover, Laquonte Adams claims in his state grand jury proceeding that the violence in Danville was more about high school beefs and groups he identified as the 600s, 700s, and 800s. There is no mention of the Rollin 60s Crips. That information does not appear until his interview with the Danville Police Department on November 13, 2018. Thus, the juxtaposition of the state grand jury transcript with his later statements to police is, in and of itself, exculpatory. Its late

disclosure, following the seating and swearing of the jury in this case, is prejudicial because defense counsel simply do not have the time to fully investigate the inconsistencies between his state grand jury transcript and later interviews with police.

(13)   Clearly, this recently disclosed evidence is favorable to the accused. "[T]he Supreme Court has held that evidence which would be "advantageous" to the defendant qualifies under *Brady*.[7]   There can be little question that these transcripts are advantageous and thus fall within *Brady's* orbit as they clearly provide materials by which the credibility of the government's cooperating witnesses may be impeached.

(14)   "The second component of a *Brady* violation requires that the prosecution suppress the favorable evidence."[8]  In further elaboration on this prong, the Ninth Circuit noted that:

> "Evidence is suppress where it is known to the State and not disclosed to the defendant.  The state's duty to disclose is affirmative; it applies even though there has been no request by the accused . . . Once the prosecutor acquires favorable information, even if she inadvertently fails to communicate it to the defendant, evidence has been suppressed."[9]

It is without question that the United States suppressed the evidence surrounding the multi-jurisdictional and special grand jury transcripts.[10]   Ms. Carlton certainly knew of the

---

[7]   *Id.* at page 7.

[8]   *Id.* at page 8 *citing Strickler*, 527 U.S. at 281-82.

[9]   *Id* at page 8 *citing Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015).

[10]   ECF 946-1 (Affidavit of Michael Newman) reveals that his office empaneled two special grand juries separate and apart from the multi-jurisdictional grand jury about which the Court was told on October 16, 2019.  Thus, Mr. Newman, by his silence during the Court's colloquy with Ms. Carlton about what transcripts may or may not have existed from the multi-jurisdictional state grand jury, lied to the Court by omission.  He knew full well that he had conducted the examination of several witnesses before the special grand juries about the very subject of the Court's inquiry.

existence of "state" grand jury testimony when she pointed out an inconsistency during her federal grand jury examination of Lashanda Washington-Anthony.

> **Ms. Carlton: "Ok and in the Grand Jury, in the state grand jury, you said a couple of things differently there than you've said here at the federal Grand Jury."[11]**

Her knowledge of these materials and the failure to disclose them is a *per se* suppression of evidence by the United States. In a sworn affidavit[12], Michael J. Newman, Esq., the duly elected Commonwealth's Attorney for the City of Danville and a full-fledged member of the prosecution team in the instant case, declared the following:

> 20. Similar to the MJGJ's practices, recordings are made of the witnesses' testimony before a special grand jury. I have not provided any of the recordings to these special grand juries to the prosecution team in this case.
>
> 21. As a result of the above, I am withdrawing as counsel of record for the United States.

It is a rare occurrence when a member of the prosecution team prepares a sworn statement acknowledging his suppression of evidence in a criminal case. In this case, that rare event has occurred.

(15) Finally, the third prong of a *Brady* violation involves a showing of prejudice to the defendant as a result of the government's suppression of favorable evidence.[13] As Judge Moon noted: "[s]ufficient prejudice exists, for *Brady* purposes, if the suppressed evidence was "material."[14] As was noted above, these transcripts provide information (or

---

[11] Lashanda Washington-Anthony Federal Grand Jury Testimony p. 89 [USAO 16270]

[12] ECF 946-1 at page 4.

[13] *Strickler*, 572 U.S. at 281-282.

[14] *United States v. Les Christopher Burns*, 6:13-cr-00022 at page 9 *citing Comstock v. Humphries*, 786 F.3d 701, 7010.

in some cases the absence of information) which will need to be fully investigated in order for the undersigned defense counsel to fulfill his 6th Amendment duty to Your Defendant. That investigation would take a minimum of two weeks (or more) to fully develop and made useful for trial. The jury in the instant case was sworn on October 15, 2016, (an important date for purposes of the attachment of *jeopardy)* and opening statements were given on October 16, 2016. It is an impossibility for defense counsel to continue normal trial preparation and be expected to properly review the several transcripts - not all of which have even been received as of this writing - let alone incorporate their content in a meaningful into a coherent trial strategy. The chaos and tumult caused by this suppression of evidence is entirely of the government's making and, therefore, would not constitute the requisite *manifest necessity* permitting retrial upon the declaration of a mistrial. Your defendant, emphatically, DOES NOT move for a mistrial. The only recourse at this point is a dismissal of the First Superseding Indictment with prejudice.

(16) Another issue of concern is the fact the Mr. Newman, in his sworn affidavit notifies the Court of the following:

> 6. Other than keeping a copy of the subpoenas that were issued in a file, my office did not keep a list or record of witnesses that were subpoenaed to the MJGJ, nor did we keep a record of the witnesses' statuses. In other words, we did not document whether a witness appeared, was interviewed, or testified.

> 7. In the last two days, I have gone back through the actual subpoenas issued by the MJGJ in an attempt to create a list of what witnesses were subpoenaed and whether they testified. (The list is attached hereto as Exhibit Two.) The portion of the list that indicates whether individuals testified or were interviewed or did not appear is based upon my recollection and review and comparison of the subpoenas to the recordings. The list of who appeared and was interviewed (and did not testify) versus who did not appear at all is incomplete, but I am still attempting to compile additional information for it.

The clear import of Mr. Newman's actions is that the Court and the defendants do not have a clear picture of who actually appeared before the multi-jurisdictional grand jury. Per Mr.

Newman's sworn affidavit, the same is true for the two special grand juries we now know were empaneled at Mr. Newman's behest:

> 17. Similar to my office's practice of not keeping a list of witnesses that appear before the MJGJ, we did not keep a list of special grand juries or the witnesses.

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means.[15] The Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process."[16]

In 2009, the Fourth Circuit applied this standard to find that a defendant had not met his burden under *Tombetta*, saying, "Under the Due Process Clause of the Fourteenth Amendment, the Supreme Court has developed '"what might loosely be called the area of constitutionally guaranteed access to evidence. The Court has specified that, to the extent the Constitution imposes a duty upon the government to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense—i.e., evidence that is constitutionally material. To satisfy this standard, evidence must: (1) possess an exculpatory value that was apparent [to the police] before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.. The mere possibility that lost or destroyed evidence could have been exculpatory is not sufficient to satisfy

---

[15] *See California v. Trombetta*, 467 U.S. 479, 489 (1984).
[16] *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

*Trombetta*'s requirement that the exculpatory value be 'apparent' to the police before its loss or destruction, which is required to establish that the police acted in bad faith."[17] A year earlier the Court reached in the same conclusion in *United States v. Matthews* on the grounds that "'the exculpatory value of the evidence [was] indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence'"[18] Thus, "mere negligence on the government's part in failing to preserve such evidence isinadequate for a showing of bad faith."[19] Here, the "bad faith" is demonstrated by the repeated falsehoods told to the Court regarding this evidence. Additionally, there can be no doubt that there is no other available method by which Your Defendant can obtain this evidence.

Without an accurate accounting of who appeared before any of the state grand juries, let alone not having the transcripts of the said potential "mystery" witnesses, the Court cannot possible know the breadth and depth of the prejudice the defendant's may be suffering. How can Your Defendant possibly make a showing of prejudice when the suppressed evidence cannot be properly identified by the very party who suppressed it in the first place?

    (17)    On October 17, 2019, from the bench, the Court stated the following :

---

[17] *United States v. Vaughn*, 453 F.App'x 424, 425 (4th Cir. 2011) (internal quotation marks and citations omitted).

[18] 373 F. App'x 386, 390 (4th Cir. 2010)(quoting *United States v. Bohl*, 25 F.3d 904, 910) (10th Cir. 1994)( citing *Youngblood*, 488 U.S. at 58).

[19] *Id.*

```
24          THE COURT:  In order for me to dismiss these charges
25   with prejudice, this really does have to shock the conscience
```

```
1    and be so outrageous that it would be -- it would be beyond
2    the pale.
```

This observation from the Court was in response to the defendants' arguments in support of their respective motions to dismiss the First Superseding Indictment on grounds of misconduct by the United States in her failure to disclose the various state grand jury transcripts. The following rhetorical question is posed to the Court: If this particular brand of prosecutorial misconduct does not shock the conscience - then what does? The prevarications, mincing of words, mendacity, and outright lies from the mouths of Ms. Carlton and Mr. Newman are nothing short of a direct attack on the rule of law.

The false statements made by Ms. Carlton and Mr. Newman before the Court could well violate 18 U.S.C. §1001 which states that: *whoever, in any matter within the jurisdiction of . . . the judicial branch . . .makes any materially false . . . statement or representation . . . shall be fined under this title, [and] imprisoned not more than 5 years.*

In a perverse irony, Ashley Ross stands indicted for NINE (9) counts of perjury in violation of 18 U.S.C. § 1623. Clearly, the sovereign has a double standard when it comes to false declarations. How can this trial continue when the basic credibility of the representatives of the United States has been compromised to a degree that is nothing short of a shock

to the conscience? I would respectfully suggest to the Court to consider the thoughts of Mr. Justice Sutherland from *United States v. Berger*[20]:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[21]

In the *Berger* case, the Supreme Court of the United States reversed the defendant's conviction because the process itself had become tainted with the foul stench of prosecutorial misconduct. In other words, the rule of law is so paramount to our very existence as a civilized society that we prefer the guilty to be set free rather than succumb to unethical and less than truthful tactics of prosecutions found in banana republics and totalitarian regimes.

In our adversarial system of criminal justice, it is the prosecutor who is supposed to be the champion of the citizens to vindicate the rule of law against criminals who break that law. Unlike a baseball game where stealing signs from the opposing pitcher while perched on second base may result in losing a mere game, cheating by the prosecution in the arena of federal criminal law may cost a defendant his liberty - in the instant case a mandatory life sentence. There can be no doubt that when first confronted about the existence of the state grand jury transcripts Ms. Carlton and Mr. Newman went out of their way to assure the court that there were only two transcripts available and known to them which were related in some way to the instant prosecution. What could possibly be more

---

[20] 295 U.S. 78 (1935)
[21] *Id.* at page 88.

shocking to the conscience, in the context of a federal criminal trial, than the direct falsehoods delivered by Ms. Carlton and Mr. Newman to the Court in an attempt to hide evidence from the defendants in this case?

The Court, respectfully, cannot and must not permit this prosecutorial misconduct to go unpunished. It is not just that the defendants were almost deprived of impeachment evidence in this case, but that the modality of the suppression was the outright deception and parsing words by Ms. Carlton and Mr. Newman. If the Court does not strike a hard blow at these "foul blows" then justice, in this case, will never be achieved. The perception in the public's mind that prosecutors can get away with attempting to suppress evidence and achieve such a nefarious goal by lying to an Article III judge in open court is nothing short of a shock to the conscience.

The great English case of Ronnie Winslow, the fourteen-year-old cadet at the Royal Naval College who was wrongfully accused of pilfering a five-shilling postal order, serves as an always relevant reminder of the primary purpose and focus of the criminal justice system: Let Right Be Done! Let Right Be Done! Dismiss the First Superseding Indictment and send the message that we as a nation, bound by the rule of law, will not permit our great adversarial system of justice to be undermined by prosecutors who seek to win at any cost with little or no regard for the truth.

WHEREFORE, Your Defendant, Dashaun Lamar Trent, by counsel, respectfully moves this Court for entry of an ORDER dismissing the First Superseding Indictment.

    Respectfully submitted,

    DASHAUN LAMAR TRENT

    By /s/    Chris K. Kowalczuk

Chris K. Kowalczuk, Esquire
P. O. Box 11971
Roanoke, VA 24022
    Counsel for the Defendant

Patrick J. Kenney, Esquire
P.O. Box 599
Roanoke, VA 24004
    Counsel for the Defendant

## **CERTIFICATE OF SERVICE**

I, Chris K. Kowalczuk, Esquire, hereby certify that on this 20th day of October, 2019, I electronically e-mailed the foregoing directly with the Court with copies to all counsel of record, including counsel for the United States.

                    /s/    Chris K. Kowalczuk